FIRST NATIONAL BANK AND TRUST COMPANY, et al., Appellants,

v.

NATIONAL CREDIT UNION ADMINISTRATION, Appellee,

and

AT&T Family Federal Credit Union and Credit Union National Association, Appellees.

No. 94–5295.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1995.

Decided July 30, 1996.

Christopher R. Lipsett, Washington, DC, argued the cause, for appellants, with whom Michael S. Helfer, Leon B. Greenfield, John J. Gill, III and Michael F. Crotty were on the briefs.

Jacob M. Lewis, Attorney, U.S. Department of Justice, argued the cause, for appellees, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, Douglas N. Letter, Litigation Counsel, Washington, DC, U.S. Department of Justice, and John K. Ianno, Counsel, Alexandria, VA, National Credit Union Administration, were on the brief, for appellee National Credit Union Administration.

Paul J. Lambert and Teresa Burke, Washington, DC, were on the brief, for appellees AT&T Family Federal Credit Union and Credit Union National Association.

Edward C. Winslow, III and William C. Scott, Greensboro, NC, were on the brief, for

amicus curiae North Carolina Alliance of Community Financial Institutions.

Before: BUCKLEY, GINSBURG, and TATEL, Circuit Judges.

GINSBURG, Circuit Judge:

Section 109 of the Federal Credit Union Act (FCUA), 12 U.S.C. § 1759, provides that "Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." The question presented in this appeal is whether the members of an occupational FCU must all share a single "common bond of occupation" or, as the National Credit Union Administration (NCUA) contends, membership may be drawn from multiple unrelated groups, each with its own common bond. The district court held that the NCUA reasonably interpreted that Act to allow members of unrelated groups to join the same credit union, provided only that a common bond exists among the members of each constituent group. 863 F.Supp. 9 (1994). Because the Congress resolved this very issue the other way, we reverse the district court and disapprove the decision of the NCUA under step one of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

## I. Background

The plaintiffs-appellants are the American Bankers Association and several North Carolina banks, including First National Bank and Trust Company (FNBT). They brought this suit against the NCUA, the federal regulatory agency that administers the FCUA, seeking to overturn that agency's approval of certain applications filed by AT&T Family Federal Credit Union (ATTF) to expand its field of membership to include employees of various small businesses in North Carolina and Virginia that are unaffiliated with the credit union's existing membership base. ATTF and the Credit Union National Association, a trade association, have intervened in support of the agency.

Under the FCUA, an FCU is, like a mutual association or a cooperative, owned and controlled by its members, *see* 12 U.S.C. § 1757(6); it can make loans to and take deposits from (formally, sell shares to) only its own members and other credit unions, *see id.* § 1757(5). The Congress expected that the Act, by "guaranteeing democratic self-government[,]" would infuse the credit union with a spirit of cooperative self-help and ensure that the credit union would remain responsive to its members' needs." *First Nat'l Bank and Trust Co. v. NCUA*, 988 F.2d 1272, 1274 (D.C.Cir.1993).

The "common bond" provision has been part of the FCUA since the statute was enacted in 1934. The Congress did not fully explicate the purpose or limits of that provision, but "assumed implicitly that a common bond amongst members would ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default. . . . The common bond was seen as the cement that united credit union members in a cooperative venture." *Id.* at 1276.

From 1934 until 1982 the NCUA interpreted the common bond requirement to mean that the members of each occupational FCU—we put aside the associational alternative, which plays no role in this case—must be drawn from a single occupational group, defined to mean the employees of a single employer. 58 Fed.Reg. 40473 (July 28, 1993). In 1982, however, the NCUA altered its interpretation of nearly 50–years' standing to allow an FCU to comprise not just one but "multiple occupational groups." Interpretive Ruling and Policy Statement (IRPS) 82–1, 47 Fed.Reg. 16775 (Apr. 20, 1982). Each such group need only be within a "well-defined area," IRPS 82–3, 47 Fed.Reg. 26808 (June 22, 1982), by which the NCUA means an area served by an actual or planned office (of which there may be any number) of the credit union, IRPS 89–1, 54 Fed.Reg. 31165, 31170 (July 27, 1989).

The 1982 change of interpretation was intended to enable each FCU to realize economies of scale and to facilitate occupational diversification within the ranks of its membership. *See* Letter from E.F. Callahan,

Chairman of the NCUA, to Congressman Fernand J. St Germain, Chairman of the House Committee on Banking, Finance and Urban Affairs 8–9 (Oct. 28, 1983). The new policy also made it possible for the employees of a company with fewer than 500 employees, the minimum for forming a new FCU, to join an existing FCU. 54 Fed.Reg. at 31171. The NCUA reiterated its new position through policy statements issued in 1989, when ATTF filed the first of the applications that FNBT here challenges, and most recently in 1994. *See id.* at 31165; IRPS 94–1, 59 Fed.Reg. 29066 (June 3, 1994). The agency explained in 1989 that "[a] select group of persons seeking credit union service from an occupational, associational or multiple group Federal credit union must have its own common bond," but "[t]he group's common bond need not be similar to the common bond(s) of the existing Federal credit union." 54 Fed. Reg. at 31176.

FNBT's complaint is at bottom that Interpretive Ruling 89–1 violates the FCUA by allowing groups lacking any common bond among them to join together in a credit union, ATTF in particular. Originally chartered in 1952 as the Radio Shops Federal Credit Union, the common bond of ATTF members was that they were "[e]mployees of the Radio Shops of Western Electric Company, Inc., who work in Winston–Salem, Greensboro, and Burlington, North Carolina; employees of this credit union; members of their immediate families; and organizations of such persons." ATTF has since grown to have 112,000 members in more than 150 disparate occupational groups spread across all 50 states, including the employees of a major tobacco company, an auto supply chain, and a television station. Its potential membership exceeds 357,000. As of January 1994 ATTF had more than 63,000 loans outstanding, totaling over $268 million. FNBT maintains that by allowing ATTF to accept members from among the employees of any number of employers, the NCUA has in effect opened the membership to anyone with a job.

Initially, the district court dismissed this case for lack of standing, 772 F.Supp. 609, 612–13 (1991); on appeal, however, we reversed on the ground that the banks are "what we have termed suitable challengers, that is ... their interests are sufficiently congruent with those of the intended beneficiaries that [they] are not more likely to frustrate than to further the statutory objectives." 988 F.2d at 1275. We remanded for a determination on the merits, as to which the district court granted the defendant's motion for summary judgment. 863 F.Supp. 9. The district court held that the common bond requirement is ambiguous and that the NCUA's interpretation of the provision to mean that "a credit union may have several groups, each with its own common bond" is reasonable.

## II.  Analysis

We review an agency's interpretation of a statute entrusted to its administration under the familiar rubric of the *Chevron* case: If the Congress has "directly spoken to the precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress"; if, however, the statute is silent or ambiguous on the question at issue, then the court will defer to the agency's interpretation if it is permissible in light of the structure and purpose of the statute. 467 U.S. at 842–43, 104 S.Ct. at 2781–82. In resolving the threshold question whether congressional intent is sufficiently clear for us to review the case under step one of *Chevron*, "we are not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." *Rettig v. Pension Benefit Guaranty Corp.,* 744 F.2d 133, 141 (D.C.Cir.1984).

FNBT argues this case under step one of *Chevron* only. According to FNBT, the intent of the Congress is clearly discernible from the statutory text and the purpose of the statute. We agree.

### A.  Section 109 by Its Terms

To repeat, § 109 provides in relevant part that "Federal credit union membership shall be limited to groups having a common bond of occupation ... or to groups within a well-defined neighborhood, community, or rural district." FNBT contends, first, that the article "a" in the phrase "groups having a

common bond" means that all members of an FCU must be united by a single occupation. The NCUA counters that the plural noun "groups" in the same phrase indicates that there may be multiple groups in an FCU, so that the statute makes sense only if it is understood to contemplate multiple bonds, each uniting a single group even if the same bond does not unite all groups, *i.e.,* the membership as a whole.

Neither syntactical argument is convincing. The article "a" could as easily mean one bond for each group as one bond for all groups in an FCU, and the plural noun "groups" could refer not to multiple groups in a single FCU but to each of the groups that forms a credit union under the FCUA. Indeed, focusing upon "groups" begs the question whether they must share a common bond; it is, after all, a common bond that makes a group of what would otherwise be a collection of individuals without a theme.

Nonetheless, use of the word "groups" in § 109 does support FNBT's interpretation and not the NCUA's. As a leading dictionary of the time put it, a group is an "assemblage ... having some resemblance or common characteristic." *Webster's New International Dictionary* 955 (1927). By this definition, a common bond is implicit in the term "group." Therefore, if two or more "occupational groups" can be said to have a common bond, it must be because there is a characteristic common to each and every member of the several groups.

Or, viewing the question another way, the term "common bond" would be surplusage if it applied only to the members of each constituent group and not across all groups of members in an FCU. Instead of limiting membership to "groups having a common bond of occupation," the Congress could, without affecting the meaning of the statute, have simply said "occupational groups." The addition of the term "common bond" is necessary only to impart the idea that the bond is one shared by all members of the FCU— regardless whether the FCU is composed of one or of multiple groups. If the members of a group are by definition bonded, then it is tautological to say that a single group has a common bond; but if multiple groups are said to have a common bond, then there is no tautology—the members of each group share the same bond as the members of the other groups.

For example, because the NCUA defines an occupational group to mean the employees of a single employer, 58 Fed.Reg. at 40473, it is redundant to require that the workers at Company A have a common bond; their employment by Company A is their common bond and that bond is what makes them an occupational group. Suppose, however, that the employees of unaffiliated Company B propose to join the FCU at Company A. The Act clearly forecloses this possibility for want of a common bond among the employees. Now suppose that Company A buys Company B, which remains a separate subsidiary. Joint ownership of Companies A and B creates a common bond extending across the two groups; the employees of Company B could then become members of the FCU at Company A.

We do not dismiss out of hand the possibility that the term "common bond"—although supererogatory when applied to the membership of a single group—nevertheless reflected ordinary usage in 1934. Moreover, having dissected enough statutes to know that they may upon occasion have redundant terms, *see, e.g., American Fed'n of Gov't Employees, Local 3295 v. Federal Labor Relations Auth.,* 46 F.3d 73, 77 (D.C.Cir.1995) ("no construction of § 1462a [of the Federal Deposit Insurance Act] can avoid rendering either subsection (1) or subsection (2) redundant"), we look further before deciding with confidence that § 109 is unambiguous on its face.

FNBT's second textual argument is that the term "groups" in the two parallel provisions of § 109—permitting credit unions composed either of (1) "groups having a common bond of occupation" among all the members or of (2) "groups within a well-defined neighborhood, community, or rural district"—must be interpreted in a consistent way. *See Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 225–27, 112 S.Ct. 2447, 2455, 120 L.Ed.2d 174 (1992). If the so-called community provision were construed in a manner consistent with

the NCUA's revised interpretation of the occupational provision, then a single FCU could include residents of any number of "well-defined neighborhood[s], communit[ies], or rural district[s]" around the country. Yet this expansive construction has never been advocated by the NCUA; on the contrary, the NCUA regulation implementing the community provision expressly requires that all FCU members live, worship, or work in "a single, geographically well-defined area." 59 Fed.Reg. at 29077.

The NCUA answers this argument by noting that the two grammatically parallel provisions of § 109 do not, upon close inspection, use the same terms: "the limitation of geographic groups to those 'within' a defined area," we are told, "clearly supports the NCUA's conclusion that membership in a community credit union may not consist of groups from widely dispersed locales." So it does; no one disputes the correctness of the NCUA's restrictive interpretation of the community clause. But the NCUA's point is not at all responsive to FNBT's argument. The question is how "groups" can be given a different meaning in the two parallel phrases: "groups having a common bond of occupation" and "groups within a well-defined [area]." The statute does not allow multiple groups, each within a different neighborhood, to form a single community FCU. Nor therefore can the statute consistently allow multiple groups, each drawn from a different occupation (which the NCUA equates with a different employer), to form an occupational FCU.

In sum, the FCUA requires by its terms that all members of a credit union share a single common bond. Our example of two companies under joint ownership meets that statutory requirement—and does so without including unrelated groups, which would drain the phrase "common bond" of all meaning. The NCUA may identify and approve other types of common bonds, subject only to the rule of reason embedded in *Chevron* step two. Indeed, the agency might define an occupational group differently—*e.g.*, all workers in the same trade—and perhaps pass muster under *Chevron*. Alternatively, the NCUA may allow multiple occupational groups to form an FCU under a common bond of "association," if one can be found. If the statute is to be read as it is written, however, the one thing that the agency may not do is permit unrelated groups to form a single FCU unless a common bond unites all of the members.

To test the hypothesis that the common bond provision means what it says, we consult briefly the purpose of the statute and its legislative history.

## B.   The Purpose of § 109

First let us dispatch the suggestion of the North Carolina Alliance of Community Financial Institutions, a trade association that filed an *amicus* brief in support of FNBT, that the Congress intended the common bond provision to foreclose unfair competition between credit unions, which are tax exempt, and banks, which are not. ("Without a meaningful common bond provision, credit unions are merely banks with a leg up on other banks.") According to the Alliance, a principal purpose of the common bond is to constrict the market that credit unions can serve, thereby limiting the threat that they pose to banks. We squarely rejected this argument on the first appeal of this case: "Congress did not, in 1934, intend to shield banks from competition from credit unions. Indeed, the very notion seems anomalous, because Congress' general purpose was to encourage the proliferation of credit unions, which were expected to provide service to those would-be customers that banks disdained." 988 F.2d at 1275. Only "as time passed—as credit unions flourished and competition among consumer lending institutions intensified—[did bankers begin] to see the common bond requirement as a desirable limitation on credit union expansion." *Id.* at 1276.

FNBT itself makes a more persuasive argument based upon the purpose of the common bond requirement. The Congress intended that each FCU be a cohesive association in which the members are known by the officers and by each other in order to "ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluc-

tant to default. That is surely why it was thought that credit unions, unlike banks, could 'loan on character.'" *Id.* There can be little doubt that growth on the scale achieved by ATTF is inconsistent with that purpose.

The NCUA points out that under its regulations a new group is not permitted to join an existing FCU unless the members are within an area that can reasonably be served from an existing or proposed office of the credit union. *See* 54 Fed.Reg. at 31170. This administrative policy might initially seem to blunt FNBT's claim that under the NCUA's current interpretation of the common bond requirement an FCU could accept anyone as a member simply because he or she is employed. Upon closer inspection, however, the agency's point is a makeweight. For whatever restraining force the common bond requirement retained after NCUA changed its interpretation of the Act in 1982, it did not impede ATTF's dramatic expansion. Indeed, as recently as 1985, ATTF's field of membership consisted basically of the employees of five AT&T affiliates who worked in, or were supervised from, certain areas within North Carolina or Virginia.

In short, reading § 109 as the 73d Congress wrote it, *i.e.,* to require that a single common bond be shared among all members of an occupational credit union, furthers the overriding purpose of the FCUA—to "unite[ ] credit union members in a cooperative venture." *First Nat'l Bank and Trust,* 988 F.2d at 1276; the NCUA's reading, which permits multiple unrelated groups to form an occupational FCU, frustrates that purpose. If this conception of an FCU seems dated in the world of ATMs and nearly nationwide financial institutions of a scale surely unimaginable in 1934, *see* Douglas H. Ginsburg, *Interstate Banking,* 9 HOFSTRA L. REV. 1133 (1981), then the case for updating the FCUA must be addressed to the Congress.

### C. The Legislative History of § 109

Finally, we look to the legislative history of the FCUA only to determine whether it so convincingly contradicts our interpretation of the text, reinforced by our understanding of the purpose of the statute, as to require that we rethink the matter. Under these circumstances, only a show stopper would do.

FNBT emphasizes the Report of the Senate Committee on Banking and Currency, which defines a credit union, in part, as "a cooperative society ... limited in each case to the members of *a specific group with a common bond* of occupation or association." S. REP. No. 555, 73d Cong., 2d Sess. 2 (1934) (emphasis supplied). The NCUA and ATTF extract their version of the legislative history from the Report of the House Committee on Banking and Currency, which paraphrases § 109 as providing that "[m]embership in Federal credit unions is limited to *groups having common bonds* of occupation or association." H.R. REP. No.2021, 73d Cong., 2d Sess. 3 (1934) (emphasis supplied); *cf.* MARY ANN GLENDON, A NATION UNDER LAWYERS 197 (1994) (quoting Karl Llewellyn: "Never paraphrase a statute"). Thus do the parties replay their jejune debate over the use of a singular article and a plural noun in the statute itself. Not surprisingly, therefore, the NCUA ultimately joins in the district court's conclusion that the legislative history of the common bond requirement is "murky" and provides only "a slender reed on which to place reliance." 863 F.Supp. at 12. Whatever the precise exchange rate between the metaphors may be, a slender reed is not a show stopper.

The district court itself assigned some weight to "the fact that Congress has not objected to ... the [NCUA's] 1982 expansion" of the common bond requirement. 863 F.Supp. at 13. In a *Chevron* step two analysis, where the issue is whether the agency's interpretation of the statute is reasonable, congressional inaction might be minimally enlightening. *See, e.g., Bob Jones Univ. v. United States,* 461 U.S. 574, 599, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983). This is a *Chevron* step one analysis, however; the silence of a later Congress says nothing about the intent of the earlier Congress that spoke directly to the question here at issue.

### III. Conclusion

Based upon the text and the purpose of the FCUA, we conclude under *Chevron* step one

that all the members of an FCU must share a common bond. If there are multiple occupational groups within a single credit union, then it is not sufficient that the members of each different group have a bond common to that group only.

Accordingly, we reverse the judgment of the district court. The case is remanded to that court for the entry of declaratory and injunctive relief, consistent with the foregoing opinion, concerning the NCUA's 1989 and 1990 approvals of certain applications filed by ATTF.

*So ordered.*